UTICA,
July, 1836.

Clarke
v.
Van Surlay.

---

## CLARKE *vs.* VAN SURLAY.

Where the *rents and profits* of an estate are given to a father during his life, and the *remainder in fee* is given to his children, and it be necessary to the support and maintenance of the tenant for life, and his family and the education of his children, that the estate should be sold, a *private act of the legislature* will be passed, authorizing the sale of the property for the above purposes, and for the payment of *debts* incurred by the tenant for life, in the necessary support of himself and family, and in the education of his children.

Such act is not unconstitutional, although its operation is limited to particular property, and bears upon a few individuals only, and does not extend to every other case of a like character.

If the sales of property authorized by such act require the assent of the chancellor, and orders are made by the court of chancery to carry the act into effect, such orders cannot be called in question by the children, or those in remainder, in an action of *ejectment* against a *bona fide* purchaser at such sales, on the ground of excess of authority, on the part of the court of chancery; the orders of that court not being *void,* the remedy, if any, is in a court of equity, or in a court of review.

THIS was an action of ejectment, tried at the New-York circuit in April, 1833, before the Hon. OGDEN EDWARDS, one of the circuit judges.

The plaintiff claimed to recover under a devise contained in the will of *Mary Clarke*, executed on the 6th April, 1802, whereby the testatrix gave a certain portion of a farm owned by her at *Greenwich*, called *Chelsea*, and also a house and lot, then occupied by one Thomas Byron, to *Benjamin Moore*, and two other persons, *in trust :* 1. To receive the rents, issues and profits thereof, and to pay the same to Thomas B. Clarke, son of her late son Clement, during his natural life : 3. From and after the death of Thomas B. Clarke, to convey the premises to his *lawful issue,* in fee ; and 3. If he should not have lawful issue, then to convey the premises to *Clement C. Moore,* a grandson of the testatrix, and to his heirs. Thomas B. Clarke died in 1826, leaving three children, and this action was brought by one of them, to recover the *third* of *three lots* of land, part of the portion of the farm at Greenwich, devised in trust, as above stated. The *defendant claimed title* to the premises, under a deed executed by *Thomas B. Clarke,* the father of the plaintiff, to *George DeGrasse,* bearing date 2d August, 1821, whereby 39 lots, part of the Greenwich farm, and including the three lots in question, were, for the consideration of $2000, sold and conveyed to the grantee, who, on the 28th March, 1822, conveyed the 39 lots, with 4 other lots, to the defendant, for the consideration of $1200, subject to a mortgage of $1000, executed by DeGrasse. The defendant claimed that Thomas B. Clarke was authorized to execute a *valid conveyance* of the property granted by him to De Grasse, by virtue of *certain acts of the legislature,* passed in reference to the property above specified ; and also by virtue of *certain orders of the court of chancery,* made under two of the said acts of the legislature, authorized and ratified by a subsequent act of the legislature. The first act of the legislature passed upon the subject authorized the *partition* of the property at Greenwich into two moieties ; one moiety to be *subdivided into lots* and *sold,* together with the house and lot occupied by *Byron,* and the proceeds invested in stocks or real securities, for the purpose of *creating an income* for the benefit and support of Thomas B. Clarke, his family and children ; the *principal* to be paid after the death of Thomas B. Clarke, according to the trusts of the will of Mary Clarke. This act was passed in 1814,

UTICA,
July, 1836.

Clarke
v.
Van Surlay.

upon the petition of Thomas B. Clarke, and with the concur-rence of the *trustees* named in the will of Mary Clarke, and of *Clement C. Moore,* the contingent remainder-man. In 1815, a further act was passed, reciting that Clement C. Moore, the remainder-man, had conveyed his contingent interest to Thomas B. Clarke, and then authorizing Clarke to do and perform every act in relation to the property which the act of 1814 had directed might be performed by trustees, to be appointed by the chancellor; but no sale was to be made by Clarke, until he had procured the assent of the chancellor; and when a sale was made, the proceeds were to be invested, and an annual account of the *principal* rendered, but the *interest* Clarke was authorized to apply to his *own use and benefit, and for the maintenance and education of his children.* In July, 1815, the chancellor made an order assenting to the sale of a *moiety* of the Greenwich property and of the *house and lot* occupied by *Byron,* and directed that the proceeds of the sale should be applied to the payment and discharge of the *debts then owing by Clarke and to be contracted for the necessary purposes of his family,* and the residue placed at *interest* on real security, upon trust that so much of the *income* as might be necessary should be applied to the suitable and proper maintenance and support of Clarke, his wife and children, and for the suitable education of his children, and that the *principal* should be held for the benefit of the *issue* of Clarke living at his death. In 1816 a further act was passed, authorizing Clarke, under the order theretofore granted by the chancellor or any subsequent order to be made, *to sell the premises* which the chancellor had permitted or might thereafter permit him to *sell,* and to apply the proceeds to the purposes required or to be required by the chancellor under the acts before passed by the legislature. In March, 1817, a further order was made by the chancellor, substantially confirming the order of July, 1815, but requiring that every sale to be made by Clarke should be approved by a master; the approbation to be endorsed upon the deeds to be executed by Clarke. These several statutes are to be found in the *Session Laws of* 1814, *p.* 77; *of* 1815, *p.* 91; *of* 1816, *p.* 57. On the trial of the cause, the defendant offered to read in evidence a certifi-

cate of approbation of a master, bearing date 5th March, 1832, endorsed on the deed from Clarke to De Grasse. The plaintiff objected to this as evidence, and the objection was sustained by the judge. Upon these facts a verdict was entered by consent for the *plaintiff*, subject to the opinion of this court upon a case to be made.

UTICA,
July, 1836.

Clarke
v.
Van Surlay.

*T. L. Wells & D. B. Ogden*, for the plaintiff.

*J. Anthon*, for the defendant.

*By the Court*, BRONSON, J.　The plaintiff makes and relies on the following objections to the defendant's title : 1. That the several acts of the legislature, passed on the application of *Thomas B. Clarke*, are, as against his children, unconstitutional and void ; 2. That the orders of the chancellor were not made in pursuance of the acts of the legislature ; and 3. That the deed of *Clarke* to *De Grasse* was not made in pursuance of the order of the chancellor, inasmuch as it was not at the time approved by a master in chancery.

The validity of these acts of the legislature was discussed by the counsel, in the case of *Sinclair* v. *Jackson*, in the court for the correction of errors ; but the decision turned upon another point, and the court cautiously avoided expressing any opinion on the question.　8 *Cowen*, 543, *Opinion of Chancellor Jones*, 579.

When the first act was passed, all the persons interested in the trust estate, who were capable of acting for themselves, were before the legislature.　*Thomas B. Clarke*, tenant for life in his own right, and the natural guardian of his children, to whom the remainder was limited ; *Clement C. Moore*, the contingent remainder-man in fee, and the *trustees* named in the will, were all applicants for the law.　The trustees had the whole legal estate, and represented the *children* of Thomas B. Clarke as fully as they could in any form have been represented on that occasion.　If, therefore, the legislature had not the power to pass this statute, it must be on the ground that, under no possible circumstances could the rights

UTICA,
July, 1836.

Clarke
v.
Van Surlay.

of infant children be affected in the same manner by a private statute.

In England, private acts of parliament have become a common mode of assurance. "It may sometimes happen," says Judge *Blackstone*, "that by the ingenuity of some and the blunders of other practitioners, an estate is most grievously entangled by a multitude of contingent remainders, resulting trusts, springing uses, executory devises, and the like artificial contrivances, (a confusion unknown to the simple conveyances of the common law,) so that it is out of the power of either the courts of law or equity to relieve the owner ; or it may sometimes happen that by the strictness or omissions of family settlements, the tenant of the estate is abridged of some reasonable power, (as letting leases, making a jointure for a wife, or the like,) which power cannot be given him by the ordinary judges, either in common law or equity ; or it may be necessary, in settling an estate, to secure it against the claims of infants or other persons under legal disabilities, who are not bound by any judgments or decrees of the ordinary courts of justice. In these, or other cases of the like kind, the transcendant power of parliament is called in to cut the gordian knot ; and by a particular law, enacted for this very purpose, to unfetter an estate, to give its tenant reasonable powers, or to assure it to a purchaser against the remote or latent claims of infants or disabled persons, by settling a proper equivalent in proportion to the interest so barred." 2 *Black. Com.* 344, 5. In *Cruise's Dig. tit. XXXIII, Private Act*, many of the cases are collected in which private acts of parliament have come under adjudication in courts of justice. Infants and other disabled persons have been bound in this manner under a great variety of circumstances. Where an opportunity offers to sell the estate to great advantage, a private act has been obtained for that purpose, with directions to lay out the money in the purchase of other lands to be settled to the same uses. Where an estate is charged with the payment of a sum of money, a sale has in this manner been authorized, in trust to pay the debt and invest the surplus in the purchase of other lands to the old uses. The tenant for life has been empowered to make leases for a long term of

years, where it would be advantageous to the estate, taking proper care to protect the interest of those in remainder or reversion; and he has also been allowed to charge that estate with money expended in making improvements beneficial to the inheritance. Partition has been confirmed as against infants, lunatics and others, by private act of parliament; and in this way an infant has been enabled to make a proper settlement on his marriage.

I do not think that acts of this description depend for their validity on what has sometimes been called the omnipotent power of parliament. In general, they provide for events which the donor of the estate did not anticipate, and make such a disposition of the property as it may reasonably be supposed the owner would approve, if he were in a condition to act. Transcendant as are the powers of parliament, it may be doubted whether private rights of property are any where more scrupulously regarded than they are in England. Special laws affecting individual interests are only passed upon the most weighty considerations; and the precautions which are usually observed for the protection of the substantial rights of the parties are worthy of all commendation.

In consequence of the imperfection which pervades all appertaining to man, cases will sometimes arise which have not been provided for by general laws, and which call for the exercise of a higher power than that possessed by courts of justice; and if individual interests can under no possible circumstances, be changed or affected by private acts of the legislature, made without consent, it may happen that an infant, with a large estate in expectancy, will be utterly destitute of the means of education and support. Although the legislature ought not to interfere upon light considerations, I cannot think that there is any constitutional impediment in the way of enacting private laws affecting individual interests, where proper care is taken to preserve the substantial rights of the parties.

The leading features of the acts in question are, *first*, that they change the trustees appointed by the will of Mrs. Clarke, and *second*, they authorize a sale of a part of the estate, with-

UTICA,<br>July, 1836.<br><br>Clarke<br>v.<br>Van Surlay.

out the consent of the children of Thomas B. Clarke, who were entitled to the remainder in fee, after the termination of his life estate. The act of 1814, pursuant to their request, discharged *Benjamin Moore* and his *wife*, and *Elizabeth Mounsell* from the execution of the trusts of the will, and authorized the court of chancery to appoint one or more trustees in their place and stead. That of 1815 repealed so much of the former statute as referred the appointment of *new trustees* to the court of chancery, and authorized and empowered *Thomas B. Clarke* "to execute and perform every act, matter and thing in relation to the real estate," "in like manner and with like effect that trustees duly appointed under the said act [of 1814] might have done." There can be little doubt that the court of chancery, without an act of the legislature, could have discharged the trustees selected by the testatrix, and appointed others in their place; and although the expediency of changing the trustees by law, instead of leaving it to the chancellor, may be questioned, it was not an act beyond the power of the legislature. The mere substitution of a new trustee could neither defeat the trust nor divest the rights of those beneficially interested in the property. The only important question in relation to the validity of these statutes, grows out of the provision for the sale of a part of the estate. It will be unnecessary to take any notice of the contingent right of *Clement C. Moore* under the will, as his interest was conveyed to *Thomas B. Clarke*, and effect was given to that conveyance by the act of 1815. It was conceded, on the argument, that the legal interest in the property under the will was in the *cestuis que trust*—that *Thomas B. Clarke* had an estate for life, and his children a vested remainder in fee in the land. Taking this as a correct exposition of the will, I proceed to inquire whether there be any valid objection to the acts of the legislature.

By the act of 1814, the new trustees were authorized to sell one equal moiety of the *Greenwich* property, and the house and lot occupied by *Byron*, and convey the same in fee to the purchasers. The principal moneys or proceeds of the sales were to be invested in stocks or real securities, and to be held by the trustees " according to the said will, that is to say, in

trust, to be assigned or paid over to the lawful issue of the said Thomas B. Clarke, living at his death."[1] The only effect of this provision upon the rights of the children, was to change part of their estate from *real* to *personal* property. Their beneficial interest was preserved entire, and in that condition was to pass into their hands at the time prescribed by the tes-. tatrix. The reason for changing the property from real to personal, was to render it more productive, and to enable *Clarke,* the tenant for life, to support himself and family, and provide for the education of his children. From the facts, recited in the statute, and those proved before the chancellor, it is evident that the children, as well as the tenant for life, were to be benefitted by this arrangement. It was the means by which they were to derive their support and receive a proper education—their father being unable to provide for them in any other way. A state of things existed which *Mrs. Clarke* probably did not foresee, and, in the language of the statute, "the benevolent intentions of the testatrix would be defeated, without the interposition and aid of the legislature." It cannot be doubted that the children, had they been capable of acting for themselves, would readily have consented to this law ; and if the power of controlling the estate of infants for just and equitable purposes had previously been conferred on the courts, it can hardly be questioned that an order for such a sale and investment as was authorized by the legislature in this case, would have been made without the least hesitation. The necessity for legislation concerning this estate, probably suggested the general provision which was subsequently made at the same session by the *act concerning infants.* *Laws* 1814, *page* 116, *chap.* 108. The 5th section of the act for the relief of *Clarke,* authorized the trustees to make and renew leases for terms not exceeding twenty one years ; but it was carefully provided, that upon the death of *Clarke,* the unexpired term or terms of any such leases should be held by the trustees in trust for the uses and purposes mentioned in the will, and none other. By the 6th section, the new trustees were subjected to the power and authority of the chancellor in the same manner as though they had been originally named in the will. The most strict re-

gard was observed, throughout all the provisions of the act for the substantial interests of the children; and, in one respect, it gave them what they had no right to demand. *Clarke* was entitled, under the will, to the whole income of the estate during his life; but by this statute the trustees were directed to set apart a portion of the annual income during the life time of *Clarke*, as an accumulating fund for the benefit of the children after his decease. But this clause was afterwards repealed. The act of 1815, which authorized *Clarke* to execute the trusts of the will, did not increase, but limited the power of the trustee over the estate. The 3d section provided, that no sale should be made by *Clarke*, until he should have procured the assent of the chancellor to such sale, who should direct the mode in which the proceeds should be invested in *Clarke* as trustee; and *Clarke* was to render an annual account to the chancellor of the principal of the proceeds of the sales, and was subject to removal for an abuse of his trust. By the act of 1816, *Clarke* was authorized to *mortgage* as well as *sell*, and to apply the money raised by mortgage or sale "to the purposes required, or to be required by the chancellor, under the acts heretofore passed" for his relief. I do not think it necessary to inquire whether, upon the true construction of these statutes, they placed any thing beyond the *income* of the property at the disposition of *Clarke*, for I entertain no doubt that the legislature has the power to direct that the whole estate of an infant, whether real or personal, shall be applied to his education and support, whenever it may be necessary to do so. In this case, although it was the duty of *Clarke*, so far as he possessed the means, to provide for his children, it appears that he was wholly unable to pay for their education and support. The necessity for reaching the estate of the children and applying it to their use, seems to have been as urgent as though they had been orphans. If, upon the true construction of the statutes, they did not authorize any interference with the *principal* of the moneys to be derived from selling or mortgaging the property, these provisions only amounted to a power to change the estate from real to personal, for the purpose of rendering it more productive, and thus enabling the father, from the *in-*

come which clearly belonged to him, to provide for his family. But if the *principal*, as well as the income, was by these acts put at the disposition of the trustee, and that course was required for the necessary education and support of the children, the legislature did not exceed its authority. General laws, much more extensive in their influence upon the rights of infants than the acts in question, have been passed and acted upon for more than twenty years, and their validity cannot now be questioned, without shaking a multitude of titles. *Laws* 1814, *p.* 116, *chap.* 108. *Id.* 1815, *p.* 103, *chap.* 106. 2 *R. S.* 194.

Although it is much the better course to enact general laws and leave their administration to the courts of justice, I cannot think the acts relating to the estate of *Mrs. Clarke* unconstitutional, merely on the ground that they provide for a particular case, without extending in their influence to every other case of a like character. The counsel for the plaintiff referred to the 13th section of the former constitution of this state, which was in force at the time when these laws were passed, and which declares, " that no member of this state shall be disfranchised or deprived of any of the *rights* or *privileges secured to the subjects of this state by this constitution*, unless by the law of the land, or the judgment of his peers." If the case under consideration were much stronger than it is, and the property of one person had been taken and given to another, without consent, and without an equivalent, it would have been difficult to show that the owner had been deprived of any right or privilege which had, in terms, been secured to him by that constitution. Whether, upon general principles, such a law would not be void as beyond the scope of legislative power, need not now be discussed. It is enough for this case to say, that in no proper or just sense of the terms, has the plaintiff been deprived of any right or privilege. She was an infant, incapable of contracting for herself—destitute of the means of support and education, and without a natural guardian of sufficient ability to provide for her necessities. To relieve her from this situation, the legislature lent its aid, and placed a portion of the property within her reach. She was allowed to anticipate the period assigned in the will for the enjoyment of

UTICA,
July, 1836.

Clarke
v.
Van Surlay.

*i*

her estate. To affirm that this was depriving her of any right or privilege secured by the constitution, is little better than saying that an infant has a constitutional *right* to grow up in ignorance, or enjoys the chartered *privilege* of suffering for the want of necessary food and raiment. The counsel also referred to that clause of the constitution of the United States which declares that no State shall pass any law " impairing the obligation of contracts ;" but I have not been able to perceive that it has any bearing on the question before the court.

The next objection on the part of the plaintiff is, that the orders of the chancellor were not made in pursuance of the acts of the legislature. I think it may be doubted whether the acts of 1814 and 1815 authorized the trustee to apply any part of the *principal* of the monies to be derived from sales to the education and support of the children ; but the chancellor, by his order of the 3d July, 1815, evidently gave those acts such a construction as reached the principal as well as the interest of the purchase moneys ; and it is probable that the act of 1816 was intended, among other things, to sanction the view which the chancellor had taken of the question. It authorized *Clarke, " under the order heretofore granted by the chancellor,* or under any subsequent order, either to mortgage or sell," and to apply the money " to the purposes *required,* or to be required by the chancellor, under the acts heretofore passed for the relief of the said Thomas B. Clarke." The greatest difficulty in upholding the orders of the chancellor arises from the fact, that they allow *Clarke* to apply a part of the proceeds of the land to the payment of his *debts.* If the debts to be paid were only such as he had incurred in the necessary support and education of his children, there was nothing very objectionable in the provision ; and perhaps that is the reasonable interpretation of the orders, although it must, I think, be admitted that they were not drawn up with all the caution, which should be observed in dealing with the estates of infants and others who are incapable of acting for themselves. On making the order of July 3d, 1815, it appeared, from the master's report, that the income of the trust property was then and for a long time had been inadequate

to the support of *Clarke's* family and the education of his children ; and that for the accomplishment of those objects, he had been reduced to the necessity of contracting and incurring debts. It also appeared, that besides a debt of $4400 to the Manhattan Company, he owed other debts, amounting to $5400 and upwards.   The order directed so much of the proceeds arising from the sales as might be necessary for that purpose, to be applied " under the direction of one of the masters of this court, in and for the payment and discharge of the debts now owing by the petitioner, and to be contracted for the necessary purposes of his family, to be proved before the master."   This clause restricted the power to pay debts to such as were then owing or might afterwards be contracted *for the necessary purposes of his family;* and the principal objection to it is, that it charged the trust estate with the necessary expenses of the whole family, instead of limiting the charge to debts contracted on account of the children. Probably the chancellor intended to look further into this matter at another time.   The master, under whose direction the sales should be made, the debts paid, and the surplus proceeds invested, was required to report his proceedings to the court ; and all persons in interest were at liberty to apply to the chancellor at any time for further orders and directions. By the order of the 15th March, 1817, *Clarke* was authorized to convey the property in payment and satisfaction of any debt or debts due and owing from him ; and he was further authorized to take the monies arising from sales or mortgages and "apply the same to the payment of his debts," &c.   This order, however, referred to the previous one of July 3, 1815, and should probably be understood to mean only such debts of Clarke as had been contracted for the necessary support of his family.   It cannot, however, be denied, that it conferred very large powers upon Clarke, not only in relation to the payment of debts, but the investment of any surplus that might remain after that object had been accomplished. The supervision of a master provided for in the former order was removed ; and but for the fact that Clarke was a trustee, and liable to be called to account as such, it would, I think, be impossible to uphold the order.   But it is unnecessary to de-

UTICA,
July, 1836.

Clarke
v.
Van Surlay.

cide whether the orders of the chancellor, or either of them, were or were not erroneous.   They were made by a court of general jurisdiction, having ample authority to act in the premises, and cannot, I think, be assailed in this collateral manner.   If the plaintiff deems either of the decrees errone-ous, the regular and proper mode of trying that question is by appeal to a court of review, or by an application to the chancellor under the power reserved to all parties in interest to apply for further or other orders and directions in the premises.   This is not only the legal and proper course, but it is the one best calculated to attain the ends of justice, and secure the rights of all parties.   Although very large powers were conferred on the trustee, it is impossible to say, on the case presented, that the plaintiff or the other children have actually suffered any injury.   What proportion of the whole estate has been sold does not appear ; and if Clarke conveyed the entire moiety of the *Greenwich* property and the house, to which the laws and orders extended, it may be that the *principal* of the purchase monies has been secured or paid to the children, or that the same was faithfully expended in pro-viding for their education and support.   A *bona fide* purcha-ser is interested in the question, and great injustice might be done by reviewing the decrees of the chancellor in this ac-tion.   It is a proper case to be examined in a court of equity, where all the facts may be ascertained, and ample justice awarded to the parties.   But whatever course the plaintiff may be advised to pursue, I think she is not at liberty to treat the judgment of a court of competent jurisdiction as absolutely void, and claim on that ground, as she does by this action, to recover the property.   If the acts of the legislature had been unconstitutional, the whole proceeding must have fallen to the ground ; but these acts were valid.   A judicial sale has been made under them ; and if the defendant's title can be questioned in any form, it must, I think, be in some other way than that which the plaintiff has adopted.

The only remaining inquiry is, whether the deed of *Clarke* to *De Grasse*, under which the defendant claims, was made in pursuance of the order of the chancellor.   It was executed in 1821, and was not approved by a master until 1832—about

the time this suit was commenced. It is unnecessary to determine *when* a master must act where a deed is to be executed with his approbation, for in this case no approval was necessary. So far as appears, this was a sale for cash, and not in satisfaction of debts; and it was only in the latter case that the approval of a master was required. *Clarke* was authorized to sell or mortgage in both of those forms, and the order then provides " that every sale and mortgage and conveyance *in satisfaction* that may be made " by *Clarke*, shall be approved by a master. The deed was properly executed.

Judgment for the defendant.