By the Cotjet.
Bosworth, J.
The Acts of April 1, 1814, of March 24, 1815, and of March 29, 1816, have been decided, by the court of dernier resort of this State, to be constitutional. The contrary has not been declared by the Supreme Court of the United States.
If it be answered, as was argued at bar, that the question of their constitutionality was not before the Supreme Court of the United States, it may be replied, that the reason why that question was not presented there was, that the District and Circuit Judge concurred in the opinion that the Acts were constitutional. If, as has been assumed, the court of dernier resort of this state has held them to be constitutional and valid, and no court has held the contrary, then their constitutionality cannot properly be treated by this court as an open question, It is its duty to accept *174 and apply the law as it has been settled by the court whose decisions are the supreme law of the state.
In Clarke v. Van Surley, when before the Supreme Court of this state, it was decided that these Acts were not inhibited by the 18th section of the State Constitution then in force, which declares, “ that no member of this state shall be disfranchised or deprived of any of the rights or privileges secured to the subjects of this state by this Constitution unless by the law of the land, or the judgment of his peersnor by that clause of the Constitution of the United States, which declares that no state shall pass any law “impairing the obligation of contracts.” (15 Wend. 445, 446.)
In Cochran v. Van Surley, (being the same case reported in the 15th of Wend.) in the Court for the Correction of Errors, the Chancellor said, “ There is not any contract which has been violated in this case by the Legislature, within the meaning of that clause of the Constitution of the United States, which prohibits the state legislatures Rom passing any laws impairing the obligation of contracts.”
After discussing the validity of certain provisions of the Acts, with reference to contingencies which might have happened, and to the rights of the parties who actually became entitled to interests in the trust estate, he proceeds to say that “ the Act of 1814, therefore, appears to have been a proper exercise of the Legislative power.”
“ And although it may not have been a discreet act of legislation to vest the legal title of the residue of the trust estate of T. B. Clarke, as is done by the operation of-the second section of the Act of 1815, no one can say it would have been an unconstitutional exercise of power, even if his general powers, as trustee for his infant children, had not been expressly restricted by the superintending power and control of the Chancellor, and by requiring the assent of that officer to any sales to be made.” (20 Wend. 377.)
“But it is supposed that the Act of March, 1816, is liable to the constitutional objection that it sanctions the order of the Chancellor, which appropriated the proceeds of the children’s property to pay off the debts of the father, and which were not contracted for their benefit. I cannot perceive, however, that the order is liable to that objection.” (Id. 378.)
*175 Verplanck, Senator, says: “ I concur with, the Supreme Court in- supporting the constitutionality of the Acts under which the sale, now impeached, was made. The first two Acts, certainly and clearly, and the third one upon the face of it, and, as far as natural and obvious construction would carry it, go no further than the exercise of that paternal power over the persons and property of infants, which under the common law was an inherent right of sovereign power, and may be exercised either by general laws, or, under peculiar circumstances, by special legis-' lation.” (Id. 879-380.) “ Under any view of the private Acts in question, I conclude that they were within the constitutional legislative authority; censurable, perhaps, for want of due caution, but not impeachable for usurpation of power.”
The reasons assigned by the courts in support of the conclusions they declared, we neither state nor discuss. It being obvious that the Acts have been directly adjudged to be constitutional by a court, whose decisions we must follow, we have nothing to do with the reasons on which its judgment was founded. (Robertson et al. v. Coulter et al. 16 How. U. S. 106.)
We enter upon the consideration of the remaining questions, with the point decided, that the Acts are constitutional.
By the 2d and 3d sections of the Act of 1815, Clarke was authorized to sell, provided he first procured the assent of the Chancellor to such sale. The third section requires that the Chancellor shall, “ at the time of giving such assent, also direct the mode in which the proceeds of such sale, or so much thereof, as he shall think proper, shall be vested in the said Thomas B. Clarke, as trustee,” Clarke being required to account for the principal only, but not for his disposition of the income. The word principal as here used, probably includes only such part of the proceeds as the Chancellor should direct to be vested in Clarke, as trustee. The Act of 1815 did not require that all of the proceeds should be so vested.
I do not discover that any court has denied the constitutional competency of the Legislature to pass Acts, authorizing the proceeds of the sale to be applied to the necessary support of those entitled to take on the death of Clarke, or to pay debts actually contracted by Clarke for their support, and, what is substantially the same thing, for that of his family, and which he was unable *176 to pay, or the competency of the Chancellor, under the Acts passed to direct such an application of the proceeds, or of some part thereof.
Between the Acts of 1815 and 1816, hut one order of the Chancellor appears to have been made, under the Acts, previous to its date. That order bears date July 3d, 1815. It was founded on a petition to the Chancellor, an order of reference to a master pursuant to the prayer of the petition, and the report of the master named in the order made pursuant to it. The petition, among other things, stated Clarke’s own inability, and the insufficiency of his own resources, and of the income of the property, to provide for the support of himself and his family, and that in order to procure the necessary funds and means, he had been reduced to the necessity of incurring debts, and having recourse to loans, one of which pretended debts was particularly specified. It prayed authority to make a sale, the assent of the Chancellor to it, and a direction “ that so much of the net proceeds of such sales as may be necessary for the purpose, be appropriated and applied in and for the payment and discharge of the said debts so contracted and incurred by your petitioner (Clarke,) as aforesaid, for the purposes aforesaid, and that the residue of the net proceeds of the said sales be vested in the name of your petitioner as trustee, as aforesaid,” &c.
On the petition reference was made to a master “ to examine into the allegations and matters in the said petition set forth and contained, and to report thereon to this court (the Court of Chancery) with all convenient speed, and that all directions be reserved until the coming in of the said report.”
The Master reported, among other things, “ That the said petitioner is indebted to divers persons in large and considerable amounts, that I have examined his several creditors as to their respective debts, and as far as proof was attainable from said creditors, it appears that the sums by him borrowed, and the debts by him contracted, with the exception of what constitutes part of the said debt due to the Manhattan Company aforesaid, were appropriated to, and incurred by him, for the maintenance of his family, as in said petition is set forth; and when such proof was not to be procured, I have taken the deposition of the said petitioner as to the application of the moneys so borrowed, from *177 which it appears that all such moneys, except as aforesaid, were applied as above stated.”
The Master further reported specific debts contracted as aforesaid, amounting in the aggregate to $5,400 and upwards; and that the rents and profits of the whole property, if unincumbered, could not be made adequate or sufficient for the support of Clarke and his family, and the education of his children, “ even if the whole thereof could be applied thereto; and that the same, after paying thereout the interest of the aforesaid debts of the petitioner, would be insufficient for the reasonable and proper support of the petitioner and his family, according to their situation in life, and would admit of no provision or allowance for the education of the children of the petitioner.”
The order of July 3d, 1815, recites the previous action of the legislature, the petition of Clarke to the Chancellor, the order of reference made upon it, and the report of the Master, and authorizes a sale of the lot in Broadway, and of the eastern moiety of the estate at Greenwich; and directs the proceeds of the sales to be paid and applied, under the direction of a Master of the court, or so much of them as might be necessary for the purpose, “ in and for the payment and discharge of the debts; now owing by the petitioner, and to be contracted for the necessary purposes of his family, to be proved before the said Master,” &c.
It then directed the surplus to be vested in Clarke, as trustee, for those of his children who might survive him, and the mode of such investment.
This was the scope and nature of the order that had been made, when the act of March 29, 1816, was passed. That order expressly provided, that so much of the net proceeds of any sales that might be made, as should be necessary for the purpose, should be applied under the direction of a Master, to pay the ascertained debts previously contracted, and such as should be subsequently incurred for the necessary support of the family of Clarke, on proof being made to the Master that the debts claimed to be, were actually of that character.
The act of March, 1816, authorized a mortgage of all lots, which “ under the order heretofore granted by the Chancellor” had been ordered, or which he might subsequently order to be sold; and it also authorized and directed all moneys raised by *178 sale or mortgage, to be applied “ to the purposes required,” or to be required by the Chancellor, “under the acts heretofore passed for the relief of the said Thomas B. Clarke.”
The purposes, to which moneys arising from a sale, were required to be applied by the Chancellor, “ under the order,” (then) “heretofore granted by” him, were payment and satisfaction of debts incurred and to be incurred, for the necessary maintenance of the family of Clarke, and the education of his children. I cannot see why the order of July 3d, 1815, so far as these parts of it are concerned, is not expressly validated, to such extent, as the legislature was constitutionally competent to do such an act.
The order of May 30, 1816, authorizes a mortgage instead of a sale, of the lots ordered by the order of July 3d, 1815, to be sold.
The order of March 15, 1817, authorized a sale or mortgage of the southern instead of the eastern moiety of the estate at Greenwich. The order concludes thus: “ And the said Thomas B. Clarke, is further authorized to convey any part or parts of the said southern moiety of the said estate, in payment and satisfaction of debts, due and owing, from the said Thomas B. Clarke, upon a valuation to be agreed on between him and his respective creditors; provided, nevertheless, that every sale and mortgage, and conveyance in satisfaction, that may be made by the said Thomas B. Clarke, in virtue hereof, shall be approved by one of the Masters of this court, and that a certificate of such approval be endorsed upon every deed or mortgage, that may be made in the premises. And it is further ordered, that the said Thomas B. Clarke shall be, and he is hereby authorized to receive and take the moneys arising from the premises, and apply the same to the payment of his debts, and invest the surplus in such manner as he may deem proper, to yield an income for the maintenance and support of his family.”
Construing this order in the light of the previous ones, and of the facts, which (as théy recite) appear by the reports of masters of the Court of Chancery, referred to in them, and as designed to effectuate the same purposes and no others, for which they sought to provide, I should construe this order as authorizing a sale in satisfaction of no debts of Clarke, except such as were due and owing, and were incurred for the necessary support of his family. *179 The previous orders sought to provide for no other debts, but did authorize such debts to be paid out of the proceeds of the sale. If the legislature could authorize the land to be sold, and the proceeds applied to pay debts incurred for such purposes, it is difficult to perceive why it might not authorize land worth enough to pay such a debt, to be conveyed in satisfaction of it. In either event, the land would be applied to the same purpose, and if the price in either case was the same, those interested in what might be left of the estate, on the death of Clarke, would be benefited by a conveyance in satisfaction, instead of a public sale, to the extent of the cost of the proceedings of such a sale: The Master was required to approve of a sale and conveyance in satisfaction of such a debt, as a condition to its . validity, for a double purpose. If a sale had been made under the previous ■orders, before he could apply any of the proceeds of the sale, in payment of Clarke’s debts, he must have proof that they were incurred for the necessary support of his family, or the education of his children; If a conveyance was to be made in satisfaction, it was doubtless intended by the Chancellor, that the Master would require, before approving of it, proof that the debt thus to be satisfied, had been incurred for the necessary support of the family of Clarke, and that the amount was just. Another security intended, was, in all probability, that the price to be allowed for the land to be taken in satisfaction, should be the fair value of the property.
By authorizing Clarke to receive the moneys arising from a sale or mortgage, “and apply the same to the payment of his debts,” it was not intended or expected by the Chancellor, that Clarke should be permitted to, or would, apply the same to the payment of any debts, except such as were contracted for the necessary support of his family and the education of his children. The payment of proceeds, to the extent necessary for that purpose, had been authorized by the order of July Bd, 1815; but that and all orders prior to that of March 1817, wisely required a Master of the court to see to such application, after proper proof of the nature and extent of the demand had been given to him. The order should not be construed to authorize an unconstitutional disposition of the property or its proceeds, when there is nothing in its terms requiring such a construction. The con *180 fidence, which seems bj the terms of the order to have been reposed in Clarke, subsequent events may have shown, was indiscreet in the highest degree; but neither that, nor his abuse of it, justifies a construction'expressly authorizing a misapplication of the property to pay debts from which his children had not, nor could derive any benefit, when not clearly demanded by the terms of the order.
The Chancellor intending that Clarke should pay with the proceeds only such debts as were incurred for the necessary support and maintenance of his family, and the education of his children, also required that any surplus remaining after satisfying such debts, should be invested “ to yield an income for the maintenance and support of his family.” The “ manner” of investing, the Chancellor, instead of prescribing by the order, left to the discretion of the trustee.
I cannot come to the conclusion that the Chancellor intended by the order of March, 1817, to authorize a conveyance by Clarke in satisfaction of any debt owing by him, except such as his previous orders authorized to be paid from the proceeds of the same property when sold; nor that he intended to confer on Clarke, the authority to pay out of the moneys coming to his own hands, and arising from sales made or mortgages executed, any debts ■ owing by Clarke, except debts of the same character.
Thus construed, it cannot be said, that either order is clearly not authorized by the acts of the legislature. The only objection that can be made to any part of either order in this respect, is that the acts by their terms only authorize a sale ; that this technically imports a transfer for money paid or to be paid, and although it is provided, by reason of the order of July, 1815, being recognized, and by implication at least, confirmed by the act of 1816, that the proceeds of such sales may be applied to pay debts owing by Clarke and contracted for the necessary support of his family, yet they do not provide that any lot may be conveyed diréctly in satisfaction of such a debt, though conveyed on an agreement to accept of it, at as high, or even a higher price than it would have brought if sold for cash, and for the express purpose of paying the same debt. Such an objection would be purely technical, possessing neither practical substance nor merit.
- The deed in question, recites, among other things, an indebted- ' *181 ness from Clarke to Peter McIntyre, the grantee, and purports to have been made in consideration of the premises recited and of $3,750 in hand, paid in cash.
It has endorsed on it, a certificate of a Master in Chancery, in this form, viz:
“ Having examined the within deed, I approve of it, as to manner and form.
“James Hamilton,
“ Master in Qhaneery.
“Dec. 14, 1818.”
It is objected that this certificate is not such an approval as the order requires as a condition to the deed’s becoming operative and effectual: that in effect it is but an approval of the form of the deed, and not of the sale which it purports to consummate. Conceding, for the sake of the argument, that the order of 1817 requires an approval of a sale, when one is to be made, or of a conveyance in satisfaction, when that is to be given, still it is silent as to the form of the certificate of approval, which it requires to “ be endorsed upon every deed or mortgage, that may be made in the premises.”
If the Master did not intend that the certificate should be one satisfying every requisite of the order, so as to make the transaction and deed valid, so far as their validity depended on the fact of his approval, and of the form of his certificate of such approval, then he intentionally violated his duty, by appearing to approve of that of which he in fact disapproved.
If he had simply certified that he approved of “ the deed,” he would naturally be understood to approve of its being executed;, and of the transaction which it concluded. Especially would! this be so, when it is borne in mind that the certificate was an, official act, and was given in discharge of a duty, making it necessary for him to approve of the sale, which the deed, was merely-an instrument to carry into effect, and that without-such approval the sale would be a nullity.
But it is insisted that the terms of the approval'- preclude the-conclusion, that he approved of the transaction, as it declares thafe he approves of it “ as to manner and form.” Approving of it as-to' *182 “ form,” approves of the form of the deed. What is fairly to be • understood by approving it “ as to manner as well as form?”
The word “ manner” is used in the order requiring his approval as meaning more than the word “ form.” Clarke is authorized to invest the surplus in such manner as he may deem proper. The word “ manner,” as there used, relates as well to the nature of the securities in which the investment is to be made, as to the form of the papers to be executed, as evidence of the parties interested in it.
“ Manner and form” is a phrase familiar in legal proceedings. Under the system of pleading in force when the code took effect, the general issue in an action of assumpsit was, “ that the defendant did not undertake or promise in manner and form, as the plaintiff had complained against him,” &c. This allegation did not put in issue the form of the count, but only the substance of the promise, for which reason the plaintiff might give in evidence a contract different from that mentioned, in regard to time or place, when immaterial, though not a contract different in substance. (1 Chit. Plead. 511.)
I think the certificate should be construed to mean that the Master approved of the substance of the transaction of which the deed was the evidence, and which it was designed to effectuate and consummate, as well as of the adaptation of its form, to give full effect to the intent of the parties.
If given solely for the money consideration it recites, it was clearly authorized by the Chancellor’s orders, and by the acts of the Legislature. If its consideration was in part a pre-existing debt owing by Clarke, and that debt was one contracted for the necessary support of Clarke and his family, it was a debt for which a conveyance in satisfaction of it might be made, or which the cash paid for the lot might be used to pay. This trial took place thirty-three years subsequent to the date of the deed. The grantee was called as a witness by the defendant. According to his testimony, the whole consideration named in the deed was made up of money paid to Clarke, and in boarding him and his children. Clarke and one of his sons boarded with him about three years. Two .other of Clarke’s children were there a part of the time. He paid in cash $150 to satisfy a board bill of Clarke’s, two bonds or notes, one of $1,050 or $950, and one for $500 “ to *183 pay for his youngest children that year,” a bill of $800 for dry goods for children’s clothing, and other bills; that Clarke was in debt to him when he ceased boarding with him. All the settlements between the grantee and Clarke were submitted to Mr. Hamilton, the Master in Chancery, for his approval. The actual consideration, as disclosed by this evidence, was cash actually paid, and boarding Clarke and three of his children, until the cash paid and the value of the board amounted to more than the price contracted to be paid for the lots conveyed. The support of Clarke and his family were purposes for which the orders of the Chancellor, in terms provided, and the orders expressly authorized the proceeds of lands sold to be applied to pay debts thus contracted, and also lands to be conveyed in satisfaction of such debts.
The deed is good on its face, and was executed according to its recitals, upon a consideration, for which one might lawfully be given. It had the certificate requisite to make it prima facie valid. It is not shown that the consideration was of a character that would not, under the acts and orders, support such a deed. On the contrary, it appears that a part of the consideration was paid in cash, and the residue of it may be regarded as a payment in advance of a debt contracted for the boarding of Clarke and his family, and the board was furnished to the full amount of the price not covered by the cash actually paid.
I do not think there is any such evidence, that the consideration was not what it purports to be, or that it was not of the character required by the acts and orders, as authorizes us to hold it absolutely void.
On the grounds on which the title derived from a purchaser, from Clarke, was held valid, in Cochran v. Van Surley, irrespective of the views I have stated, that acquired by the plaintiff, entitles him to the judgment of the court.
In the case of Cochran v. Van Surley, the only opinion furnished by any one dissenting from the conclusions reached by a majority of the members of the court, places the dissent “on the single ground, that the sale and conveyance by Clarke, not having been approved by a Master until years after his death, when the title had passed to the present plaintiffs, were void and inoperative.”
*184 We do not feel at liberty to say, that the court of last resort, •when this case comes before it, will overrule the decision made in Cochran v. Van Surley.
In Williamson v. Berry, 8 How. U. S. S. C. R. 507, the consideration of the deed, under which the defendant claimed title, was proved to have been an amount due De Grasse for oysters, furnished by him to Clarke, out of an oyster shop, which the former kept: some wild lands in' Pennsylvania or Virginia, and some items of money lent, and the Master actually refused to approve of the deéd, on account of such being its consideration. (Id. p. 539.)
That deed might well be void, and yet this be valid.
In Williamson v. The Irish Presbyterian Congregation in the City of New York, id. p. 565, the report of the case states, that the same facts, and principles were involved, as in the suit against Berry, the only point of difference stated, not being pertinent to the question of the actual consideration of the deed from Clarke, under which the defendants, in the latter suit, made title.
In Williamson v. Ball, 8 id. 566, the conveyance from Clarke was made to one Abbott Christie, and recited that Clarke was justly indebted to‘Christie, “in the sum of $525, and is willing to convey in satisfaction of such debt, the premises hereinafter mentioned and described,” and declares that “ in consideration of the premises, and of $525, in hand, paid,” he conveys, &c. That deed was approved by the same Master who approved the one in question.
The court, in its opinion, treated the deed as one executed in satisfaction of the debt owing by Clarke to Christie, of $525.
That court said, “ To the third point in this case, we rule, that the Chancellor had authority, under the acts passed for the relief of Thomas B. Clarke, to assent to a conveyance of the premises in dispute by his trustee, but that it was not within the jurisdiction given to the Chancellor by the acts of the State of New York, mentioned in this case, to order that the trustees might make a conveyance of any part of the premises devised, as is mentioned in the ease for a precedent debt due by the trustee to his grantee.” (Id. 568.)
That was therefore treated as .a deed given in satisfaction of a precedent debt owing by the trustee, and not appearing, even *185 from its recitals, to Raye been contracted for tbe necessary support of Clarke and bis family. Tbe deed before ns, does not, in terms, declare tbat it was given, even in part, in satisfaction of any previous debt of tbe trustee, and tbe proof of tbe actual consideration does not tend to prove tbat sucb was tbe fact.
■ Tbe Supreme Court of tbe United States, in tbe opinion of tbe majority of tbe court, say, citing tbe language of Senator Yer-plancb, tbat “ Tbe order made under tbe first two acts was in contravention of tbe statute, so far as it allowed a part of tbe proceeds of tbe sale to be applied to tbe payment of Clarke’s former debts. Nor do I tbink tbat tbe words in tbe act of 1816, ratified tbe former orders, or extended tbe Chancellor's powers in future orders, as to tbe liberty of applying tbe principal of tbe funds, of wbicb, according to tbe acts heretofore on this subject, tbe interest only was to be expended.” (8 How. U. S. S. C. R. 540.)
But tbe words in tbe act of 1816, do state, tbat Clarke “ is hereby authorized, under tbe order heretofore granted by tbe Chancellor,” to. mortgage or sell, &c., and “ to apply tbe money so raised by mortgage or sale, to tbe purposes required, or to be required by tbe Chancellor, under tbe acts heretofore passed for tbe relief of tbe said Thomas B. Clarke.”
Tbe order of July 3d, 1815, peremptorily required, so much of tbe moneys arising from a sale, as should be necessary for tbe purpose, to be applied to pay certain debts proved to have been incurred by Clarke, for tbe “ necessary purposes of bis family,” and tbe moneys arising from wbicb, be was proved to have applied to tbe support of bis family; and also to pay debts “ to be contracted for tbe necessary purposes of bis family, to be proved before tbe said Master.”
Bronson, J., in Clarke v. Van Surley, 15 Wend. 446, says, “ tbat the Chancellor, by tbe order of tbe 3d of July, 1815, bad evidently construed tbe previous acts as conferring authority to reach tbe principal as well as tbe interest, and it is probable tbat tbe act of 1816 was intended, among other things, to sanction tbe view tbe Chancellor bad taken of tbe question.” * * * “ Tbe greatest difficulty in upholding tbe orders of tbe Chancellor arises from tbe fact, that they allow Clarke to apply a part of tbe proceeds to pay bis debts. If tbe debts to be paid were only sucb as be had incurred in tbe necessary support and education of bis children, *186 there was nothing very objectionable in the provision: and perhaps that is the reasonable interpretation of the orders,” &c. * * * “ By the order of the 15th of March, 1817, Clarke was authorized to convey the. property in payment and satisfaction of any debt or debts due and owing from him, and he was further authorized to take the moneys arising from sales or mortgages, and apply the same to the payment of' his debts,” <&c.. “This order, however,- referred to the previous one of July 3d, 1815, and should probably be understood to mean only such debts of Clarke as-had been contracted for the necessary support of his' family.” (Id. 447.)
The Supreme Court of the United States has-not-decided,.that the acts and order, did not confer valid authority to make a sale' and conveyance, the consideration of which was, in part, a payment of a debt contracted for such a purpose, and as to the residue of it, money. No such question was before.it. -
In the case before us, the deed-recites a money consideration. It does not, in terms,- declare that satisfaction of -any precedent debt owing by Clarke to McIntyre, formed any part of the consideration. It recites the fact, that Clarke was then indebted to McIntyre, but no amount is stated, nor does the deed affirm that it is executed to satisfy any part of such debt.
There is nothing in the testimony of McIntyre, tending to show that the consideration was not, exclusively, cash paid, and board furnished to Clarke and three of his children. On such a state of facts, and in an action of ejectment,-brought by a bonâ fide purchaser, I do not think this court is justified in holding that the deed to McIntyre is clearly void, and that the title under which the plaintiff claims, is clearly and utterly invalid.
All the children of Clarke who survived him, were in being before' .any sales were made, or mortgages executed, "under the order of March 15, 1817. Bayard -Clarke, the youngest of the surviving children, was born on the 17th of March, 1817.
Although the fact, that the order of the Vice-Chancellor, requiring Shepherd to. complete the purchase which he had made. on the plaintiff’s account,-was affirmed by the Chancellor, on appeal, on the ground that the title was good, cannot affect the rights of the real defendants in this action, they not having been parties-to those proceedings; yet thé fact that such orders were *187 made, should not make the court less cautious in coming to the conclusion, that the plaintiff’s title cannot be upheld.
In whatever manner the court of last resort of this state has construed, or may construe these statutes, the Supreme Court of the United States is as much bound as this court to accept and follow that construction, in deciding questions arising under them, unless the statutes as thus construed, shall be deemed open to the objection that they impair the obligation of contracts, or are for other reasons, as thus construed, liable to be adjudged by that court null and void. (Robertson, et al. v. Coulter et al. 16 How. U. S. 106.)
We think the judgment appealed from should be affirmed.