By the Court. Duer, Justice.
This is one of the long pending equity cases which, by an act passed by the Legislature, in 1849, were transferred from the Supreme Court to this court, and directed to be heard at a General Term thereof. It was accordingly heard upon the pleadings and proofs at the December General Term, before Mr. Justice Bosworth, Mr. Justice Woodruff, and myself, and I am now to state the conclusions, and the reasons upon which they are founded, that a careful examination of the case has led us to adopt.
The relief sought by the bill is, that the defendant, Davenport, may be compelled to surrender to the plaintiffs the possession of three lots of ground, situate on the south side of Twenty-eighth Street, between the Ninth and Tenth Avenues, in this city, and to account to them for the rents and profits received by him during the time he has held the possession. The ground upon which their title to this relief was finally placed by the learned Counsel, who, with so much ability, as well as zeal and perseverance, has conducted this and many other suits on their behalf, will hereafter be distinctly stated.
The defence is, that the defendant, Davenport, has a valid and unimpeachable title, both at law and in equity, to the lots in question, derived by sundry mesne conveyances from one Thomas Ash, to whom the lots were sold and conveyed, in November, 1817, by Thomas B. Clarke, the father of the plaintiffs, by virtue of the power and authority that it is alleged were vested in him, by certain acts of the Legislature, and orders of the Chancellor, to which it will be necessary hereafter more par *98 ticularly to advert. It also appears from the hill, and the' answers, that, in 1840 or 1844, the lots in question, for the purpose of satisfying certain unpaid assessments, were sold by the corporation for the term of 500 years, to the defendant, Wheeler, and that the lease granted to him by the corporation has since been assigned to and is now held by the defendant, Davenport, but without expressing or intimating an opinion as to the legal effect of this transaction, had the necessary proofs of the regularity of the assessment and sale been given, we shall dismiss it from further consideration and notice, and confine ourselves entirely to the facts and circumstances necessary to be considered in judging of the validity of the original sale and conveyance to Ash. We are satisfied that it is upon the validity as against the plaintiffs of the title thus acquired, that the case wholly turns.
The facts necessary to be stated, and borne in mind in the consideration of this question, are the following:—
The lots in controversy belonged to an estate at Chelsea, in this, city, of which Mrs. Mary Clarke died seized, in the year 1802, and were included in that part of the estate which, by her last will and testament, she devised as follows: “To Benjamin Moore, and Charity, his wife, and Elizabeth Maunsell, and their heirs, as joint tenants and trustees, in trust to receive the rents and profits thereof, and pay the same to Thomas B. Clarke during his life, and after his death in trust to convey the same to his lawful issue, who shall be living at his death, in fee, and if he shall not leave such issue, then to my grandson, Clement C. Moore, in fee.” Thomas B. Clarke, the equitable tenant for life, died in 1826, and upon his death the remainder in fee, whether legal or equitable, looking alone to the words of the devise, vested in the plaintiffs, who were his only children and issue then living. Hence, unless the title given to them by the devise had been previously and lawfully divested or defeated, they are the unquestionable owners of the lots in controversy.
In 1814, the Legislature, upon the joint application of Thomas B. Clarke, the trustees, and the ultimate remainder man, C. C. Moore, passed an act discharging wholly from their trust the trustees named in the will, and authorizing the Court of Cham eery to appoint others in their place, with power not only to exe *99 cute the trusts of the will, but to perform the duties specified in the act. The act then empowered the trustees so to be substituted to divide the lands devised into two equal parts, one part to be held by them to the uses, and upon the trusts declared in the will, the other to be subdivided into lots, which, upon certain terms, they were authorized to sell and convey, so as to pass to purchasers all the right, title, and interest, of the testatrix, Mary Clarke, at the time of her death, The proceeds of such sales the trustees were directed to invest in public stocks, and other securities, and to invest annually a moiety of the income, and accumulate the same for the benefit of the devisees in remainder, to be paid to them on the death of Clarke. The residue of the income they were directed to pay to Clarke, as it accrued for his own use and benefit, the maintenance of his family, and the education and support of his children. There are other provisions in the act which it is deemed unnecessary to state, except the declaration that the trustees to be appointed should be adjudged trustees under the will, in like manner as if they had been named and appointed therein, evidently meaning, that in addition to the powers given to them by the act, they should possess not only the same powers, but the same estate that were given and devised to the original trustees by the terms of the will—an observation, of .which the bearing and perhaps the materiality will hereafter be seen.
Ho action was had in the Court of Chancery under this act; no trustees were appointed, and no orders made; and in 1815, the Legislature, upon the petition of Clarke, passed another act, some of the provisions of which, it will not be inexpedient to state; the statement is requisite to a full exposition and clear understanding of our views upon the questions hereafter to be considered and determined.
Before this act was passed, C. C. Moore, the ultimate remainder man, had released to Clarke all his interest in the trust estate; and the act, after reciting this feet, vested the contingent interest of C. C. Moore in the proceeds of any property that might be sold in Clarke and his heirs. It then repealed so much of the former act as required a part of the income, arising from the proceeds of the property that might be sold, to be invested; and also' so much as required the several duties mentioned in *100 that act, to be performed by trustees to be appointed -by the Chancellor. The second section of the act then authorized and empowered Clarke to execute and perform every act, matter, and thing, in relation to the trust estate; and in like manner, and with the like effect, that trustees, duly appointed under the former act, might have done; and directed him, as the trustee, to apply the whole of the interest and income of the property to the maintenance of his family, and the education and support of his children. The third section of the act declared, that no sale of any part of the estate should be made by Clarke, without the assent of the Chancellor, whose duty it should be, in giving his assent to a sale, to direct the mode in which its proceeds, or so much thereof as he.should think proper, should be vested in Clarke, as trustee. It was then made the duty of Clarke, to render annually to the Chancellor, or to some person appointed by the Chancellor for that purpose, an account of the principal of the proceeds of every sale made by him, not including the interest, which he was to be at liberty to apply in such manner as he might think proper for his own use and benefit and the education and support of his children. The same section empowered the Chancellor, should he deem it to be necessary, to remove Clarke, as a trustee, and appoint another in his stead; adding, “subject to such rules and regulations as he may prescribe in the management of the estate hereby vested in the said Thomas B. Clarke as trustee.”
Before I proceed to state the proceedings in the Court of Chancery, and of Clarke himself, under this act, I deem it expedient to explain briefly the legal effects of its various provisions, not only as those provisions are now understood by ourselves, but as, in prior cases, arising and determined in our own courts, they have hitherto, and almost uniformly, been understood and interpreted.
It is manifest that they extinguished wholly the original trust, as created by the will of Mrs. Clarke, so far as it related to the life estate of Clarke himself. Until the passage of this act, his interest and estate were purely equitable; but as the whole legal estate, which during his life was, by the terms of the will, vested in the trustees therein named, was now vested in him, his equitable was. of necessity, merged in the legal estate with which, by *101 the operation of the act, it was united. Hence the act, by constituting Clarke the sole trustee, made him so exclusively for those entitled in remainder—that is, his children then living, and those who might thereafter be born. He was a trustee for them as their trustee, he was clothed not only with all the powers that would have belonged to trustees duly appointed under the act of 1814, but also with all the estate that would have vested in them, arid that was vested in the trustees named in the will. If the will gave a fee to the original trustees, it was a fee that, by the act of 1815, was given to Clarke. Under the provisions of this act, no sales could be made by Clarke, as trustee, without the previous assent of the Chancellor. —if in any proper sense’ of the term he was a trustee at all—and,
In June, 1815, he presented a petition to the court, stating his inability, and the insufficiency of his own resources, and of the income of the property, to enable him to provide for the support of himself and family; and that in order to procure the necessary means for that purpose, he had been reduced to the necessity of contracting various debts, one of which the petition specified, and prayed that he might be authorized, by an order of the court, to sell the eastern half of the trust estate, and to apply so much of the "net proceeds of the sales as might be necessary to the payment and discharge" of the debts so contracted, and to invest the residue of such proceeds in his own name, as trustee, in such manner as the court might direct. This petition was referred to one of the masters of the court; who reported, that it appeared to him, from the examination of the creditors, and of Clarke himself, that the debts mentioned and referred to in the petition, with the exception of one due to the Manhattan Company, had been contracted and incurred by the petitioner, as stated in the petition, for the necessary support of his family; and that they amounted in the aggregate, as they were specified in the report, to the’sum of $5,400, and upwards; that the rents and profits of the whole property could not be made adequate to the support of the petitioner and his family, and the education of his children, even could they all be applied to that purpose; and that, after paying thereout the interest on the debts so contracted, they would be insufficient for the proper support of the petitioner and Ms family, according to their situation in life, and *102 would admit of no provision or allowance whatever for the education of the children.
On the 3rd day of July, in the same year, Chancellor Kent made an order, approving, and founded on the report of the master, and containing (inter alia) the following provisions; It declared, that the assent of the Chancellor was thereby given to the sale by Clarke of the eastern moiety of the trust estate, to be divided as mentioned in the petition, and authorized and directed him to sell and dispose of the same, under' and according to the acts of the Legislature, in that behalf. It further ordered, that the sales should be made under the direction of one of the masters of the court, to whom the purchase moneys of the premises sold should be paid by-the purchasers, to be disposed of by him in the manner thereinafter directed. It then directed, that so much of the net proceeds, arising from the sales, as might be necessary for the purpose, should be applied, under the direction of a master, in and for the payment and discharge of the debts then owing by the petitioner, and to be contracted for the necessary purposes of his family, and to be proved before the master. The order contained other provisions relative to the investment of the surplus proceeds of sales, the trusts upon which the same should be held, and the application of the income arising therefrom, which, as having no bearing on the question now to be determined, are omitted.
It is to be observed that the authority so far given to Clarke was limited to sales, and for the purpose of enlarging his powers as trustee, the Legislature, upon his application, passed, on the 29th of March, 1816, the following act:—
“ Be it enacted, &c., &c., that Thomas B. "Clarke be and is hereby authorized, under the order heretofore granted by the Chancellor, or under any subsequent order, either to mortgage or sell the premises, which the Chancellor has permitted, or hereafter may permit, him to sell as trustee under the will of Mary Clarke, and to apply the moneys so raised by mortgage or sale, to the purposes required, or to be required, by the Chancellor, under the acts heretofore passed for the relief of the said Thomas B. Clarke.”
Some of the questions hereafter to be determined depend materially upon the proper construction of this act. We have *103 therefore given its exact words, that it may be seen whether they justify the construction that we adopt, and by which we mean to be governed. That construction I shall now proceed to state
It seems to us an evident mistake to suppose that the act merely gave to Clarke, as trustee, an authority to mortgage as well as to sell, without affecting at all the construction of the previous acts of the Legislature and the order of the Chancellor. By referring in terms to the order “heretofore granted by the Chancellor ” (which can only mean the order of July 3d, since no other had then been made), and by authorizing Clarke to apply the money, to be raised by mortgage or sale, to the purposes required by the Chancellor (which can only mean the purposes required by the order), the act of 1816, it seems to us, adopts and sanctions the Chancellor’s order, so far as relates to'the application of the money to be raised, just as certainly and effectually as if the order had been literally recited and in terms enacted. If the language of the act has any meaning, it gives an express authority to Clarke to apply the money to be raised by him as trustee to the purposes specified in the order— that is, the payment of debts contracted and to be contracted by him for the support of his family and the education of his children. Nor can we think that this conclusion is at all weakened by the closing words of the statute, “under the acts heretofore passed for the relief of the said Thomas B. Clarke." We cannot interpret these words as "making the validity and adoption of the Chancellor’s order depend upon its conformity to the prior acts which are referred to; on the contrary, if these words refer to the order at all, which may reasonably be doubted, we regard them not as imposing a condition, but as declaring as a fact that the order was made under the acts referred to; that is, in conformity to their provisions. Let the act be read with the omission of the word, “or hereafter may permit,” and “or to be required” (which, as they relate exclusively to future orders, have no bearing on the question), and we think it will not be doubted that the construction we have given expresses truly the intentions of the Legislature. Certainly the Legislature could not have supposed that Chancellor Kent meant to violate the laws under which he was acting, by exceeding the authority which they conferred. It must therefore have regarded his *104 order as conclusive evidence of the construction which he gave to the acts from which his powers were derived, and consequently it is this construction that the Legislature, by affirming his order, meant to ratify and declare. That such was the just interpretation and legal effect of the act of 1816, was held by Mr. Justice Bosworth and myself in Towle v. Forney, and we are confirmed in the opinion then expressed, not only by our own reflections, but by the full assent of Mr. Justice Woodruff.
But although the act of 1816 affirms the order of July, so far as relates to the purposes to which the money to be raised by the trustees should be applied, it effects in other respects a very material change. By the terms of the order, the moneys arising from the sales were directed to be paid by the purchaser to one of the masters of the Court, upon whom the duty of seeing that they were properly applied was directly imposed. But the act of 1816 authorized Clarke himself as trustee to apply the money raised by sale or mortgage to the purposes required by the Chancellor, and as a necessary consequence gave him the right to receive that which he was authorized and bound to apply; and such is the interpretation that was given to the act of the Chancellor in the next and last order, to which I shall refer.
This order, which, like that of 1815, was founded on the petition of Clarke, and the report of a master, was made by the Chancellor on the 15th of March, 1817, and authorized Clarke as trustee to sell or mortgage the southern instead of the eastern moiety of the trust estate, and to receive and take the moneys arising therefrom and apply the same to the payment of his debts, and invest the surplus in such manner as he might deem proper, to yield an income for the maintenance and support of his family. The order also authorized Clarke to convey any part or parts of the said southern moiety in payment or satisfaction of any debt or debts owing by him, upon a valuation to be agreed on between him and his respective creditors, adding this proviso, “provided, nevertheless, that every sale and mortgage and conveyance in satisfaction that may be made by the said Thomas B. Clarke, in virtue hereof, shall be approved by one of the masters of this Court, and that a certificate of such approval be endorsed upon every deed or mortgage that may be made in the premises.” Certainly the general words of this.provisp *105 seem to embrace every deed or mortgage that Clarke as trustee might thereafter lawfully execute, but it has been held by the Court of Errors in Clarke v. Van Surlay, and by the Court of Appeals in Towle v. Forney, that the proviso applies only to conveyances in satisfaction of debts, and that where the conveyance is for cash only, no certificate of the approval of a master is required to be endorsed. Hence it will not be necessary to consider at all the objections that have been taken to the sufficiency of the master’s certificate, which it will be seen hereafter is endorsed upon the conveyance from which the defendant derives his title; for if this conveyance must be regarded by us as made for cash actually paid, and it is only upon that ground that it can be sustained, the nullity of the certificate, whether admitted or adjudged, would in no degree affect its validity. The objections that have been relied on will therefore be passed over as irrelevant.
Various questions regarding both the validity and the construction of the several acts of the Legislature, and of the several orders of the Chancellor, that have now been substantially recited, have been raised by the plaintiffs in prior suits relating to other portions of the trust estate; but all these questions, with perhaps a single exception, have in our opinion been settled by determinations of controlling authority. It will, however, be expedient to state them, in order that they may be carefiilly separated from those which, upon the pleadings and proofs in this case, are in our judgment alone open for determination.
The original contention on the part of the plaintiffs was, that all the acts of the Legislature that have been cited, including even the act of 1814, were wholly inoperative and void, upon the ground that the Legislature, under the constitution of the United States, and of this State, had no right so to alter the provisions of Mrs. Clarke’s will, as to sanction the alienation in fee in any form and for any purpose, of any portion of the estate, to which the children of Clarke, living at his death, by the terms of the will, would be entitled. It was, however, determined by the Supreme Court, upon full consideration, in the case of Clarke v. Van Surlay (15 Wend. Rep. 436), and by the Court of Errors in affirming its judgment (Cochran v. Van Surlay, 20, Wend. Rep. 365), that although some of the acts in question might be *106 objectionable in other respects, they must all be deemed a constitutional exercise of legislative power, and as such were valid in all their provisions. The reasons for this determination were very clearly stated by Mr. Justice Bronson, in the Supreme Court, and by Chancellor Walworth and Senator Verplanck, in the Court of Errors, and were briefly recapitulated by Mr. Justice Bosworth in delivering the, judgment of this Court in Towle v. Forney.
Passing, then, from the acts of the Legislature to the orders of the Chancellor, it was held, both by the Supreme Court and the Court of Errors, in the cases to which I have referred, that they were made in the exercise, not of a ministerial or special, but of a judicial authority; that the sales, made by.the trustee in conformity to the orders, were therefore to be regarded in all respects as judicial sales, having the same validity and effect as a sale under' a judgment and execution, regular and valid on their face; that it was therefore unnecessary to determine whether the orders of the Chancellor were or were not in strict conformity with the prior acts of the Legislature—since, although as erroneous they might be liable to be reversed, they were certainly not void so. as to affect the title of a purchaser in good faith from the trustee. Upon these grounds, judgment was rendered for the defendants, who claimed under a conveyance from Clarke, which was adjudged to' have passed the legal title.
It must be admitted that great doubts were expressed by the learned Judges who delivered opinions in this case, whether the orders of the Chancellor, in their whole extent, were warranted by any just interpretation of the statutes under which he was acting; and it was even intimated that, upon this ground, the children of Clarke, although debarred from a recovery at law, might be entitled to some relief in equity; but the construction that we gave in Towle v. Forney, and must still give to the act of 1816, relieves us from the necessity of considering at all the questions that gave rise to the doubts to which we refer. The act of 1816, as we construe it, sanctioned the application by the trustee of the immediate proceeds of sales, as well as the income of proceeds invested as capital, to the maintenance and support of his family and the education of his children, and also to the satisfaction of the debts which he had then incurred, or might *107 thereafter incur, for the same purposes; and it was only upon the ground that the Chancellor’s order of July, 1815, directed or authorized the same application of the proceeds of sale, instead of being limited to the income of such proceeds when invested as capital, that its validity was denied or doubted. It is evident, however, that in the present case, it is quite immaterial whether the order of July was or was not valid when made hy the Chancellor, if it certainly became so, as we hold it did, from the time it was enacted by the Legislature.
The terms of the subsequent order of March, 1817, limiting the word “debts,” by a reasonable interpretation, to “debts” contracted by Clarke for the support of his family, are in perfect harmony with our construction of the act of 1816; and it must be borne in mind, that it is under this last order that the sale and conveyance were made Upon which the defendant, Davenport, founds his title. Whether, had they been made under the first order, and before the passage of the last statute, they might not have been invalidated in a court of equity, is a question that does not properly arise, and which we therefore decline to consider. It is proper to add, that the construction that we give to the act of 1816, has not affected our opinion as to its validity,, since we entirely agree with Mr. Justice Bronson (15 Wendell, R. 444), that the Legislature had an undoubted right to direct the application of the principal, arising from the proceeds of sales as well as of the income, to the purposes of the relief which the condition of Clarke and his family was believed to require.
The plain and necessary result from the observations that have now been made, is this—that Clarke, when he made the conveyance to Ash—of which a copy is annexed to the bill— had full power and authority, under the statutes and orders that have been cited, to sell the lots in controversy, and to give to a bona fide purchaser, a valid and indefeasible title, and just as indefeasible in a court of equity as of law. Although a trustee, he was just as competent to give such a title as an absolute owner.
The sole question, therefore, that remains to be considered is, whether, upon the evidence before us, we are not bound to hold that Ash, to whom the conveyance of the lot in controversy was made, was a purchaser in good faith and for value. The bill, indeed, admits, and the answer asserts, that the defendant, *108 Davenport, had derived a title from Ash; but, as the nature of his title has not been shown, it is obvious, and was not denied by his counsel, that he stands in the same condition as the original purchaser. As the case stands before us, it is upon the validity of Ash’s title that his own depends.
The conveyance to Ash was produced and read upon the hearing, and its due execution and delivery admitted.
It is an indenture of bargain and sale, made on the 12th of November, 1817, between Thomas B. Clarke, of the first part, and Thomas Ash, &c., of the second part; and after reciting that Clarke, by virtue of sundry conveyances, acts of the Legislature, and orders of the Court of Chancery, was empowered to sell and mortgage the southern moiety, or any part thereof, of the estate at Greenwich, devised by Mary Clarke, deceased, to him and his children, and that he had agreed to sell to Ash the premises thereinafter described, it proceeds as follows:
“How, this indenture witnesseth, that the said Thomas B. Clarke, in consideration of the premises, and of the sum of five hundred and twenty-four dollars, lawful money of the United States, to him in hand paid by the said party of the second part, at or before the sealing and delivery of these presents, and the receipt whereof is hereby acknowledged, hath granted, bargained, and sold,” &c., &c.; proceeding, then, by apt words of description and limitation, to convey to. Ash, in fee, the lots in controversy, which, it is admitted, were a part of that southern moiety of the estate which Clarke was empowered to sell.
In conformity to the views we have already expressed, we cannot do otherwise than hold that this conveyance, in its terms, and upon its face, was exactly such as Clarke, by virtue of the act of 1816, and the subsequent order of the Chancellor, had full authority, as trustee, to make.
If this conveyance, therefore, was of itself competent evidence, that it was in reality founded upon the pecuniary consideration therein stated, and that this consideration was, in fact, paid, it is plain that the burden of proof to impeach its validity, was cast upon the plaintiff. The acts of the Legislature, the order of the Chancellor, and this deed, constituted all the proof that the defendants, in the first instance, were bound to give, to establish a perfect defence.
*109 The allegations in the bill are, that the consideration set forth in this conveyance was not the real and true consideration; that the only consideration, if there was any, was an antecedent debt of Clarke, contracted long previously to the date of the conveyance, and before the passage of any of the acts of the Legislature that have been referred to, and not contracted for, or on account of any of the purposes of the family of Clarke; and that no money was advanced or paid by Ash, or any other person, at the time of the execution of the conveyance, or at any other time, for or on account thereof.
We are not prepared to say that, had all these allegations, which are expressly denied in the answer, been proved upon the hearing, the title of Ash would not have been effectually overthrown, and the plaintiffs have been entitled to the full relief which they demand; but no such proof was given, or attempted to be given, and the allegations stand now, as they stand in the bill, as naked assertions, which, being contradicted by the defendants, we, as a court, are bound to reject.
It is true that there are other allegations in the bill, tending to impeach the validity of the conveyance to Ash, and in support of which, evidence was offered upon the hearing, but the evidence so offered, and which was received, subject to objection, tended only to prove that Clarke had neglected his duties as a parent and trustee, by failing to make that provision for the support and education of his children, that he. was authorized and bound to make. It tended only to. prove that in many respects he had abused his powers and violated his trust, but there was no proof of any such abuse or violation in respect to the sale in question; and were it admitted that his own intentions were fraudulent in making the sale, there was not an atom or scintilla of proof that his intentions were known to, or suspected by, the purchaser.
What, then, it may well be asked, are the grounds upon which a judgment in favor of the plaintiffs is now demanded ? The grounds upon which their able Counsel finally placed their title to relief are the following:
First. That the burden of proving that the deed to Asb was founded upon a valuable consideration, rested upon the defendants, and that the recital of such a consideration in the deed, *110 being no evidence of the fact as against the plaintiffs, and no other evidence having been given, the Court is bound to say that the deed was without consideration, and therefore wholly void.
Second. That upon the supposition that the consideration mentioned in the deed, and its payment to Clarke, were sufficiently proved, the purchaser, Ash, was bound to see—the Revised Statutes not being then in force—that the purchase-money was properly applied to the purposes of the trust, and that his neglect of this duty rendered the deed inoperative and void; and,
Lastly. That the orders of the Chancellor, under which the sale to Ash was made, were obtained by false suggestions, and a concealment and virtual misrepresentation of material facts.
These several propositions will be considered in the order in which they have been stated:—
First. The position that he who claims title under a deed of bargain and sale, valid on its face, and of which the execution ( and delivery are proved or admitted, in order to entitle him to read it in evidence, is bound in any case to show, by extrinsic proof, that it was really founded on the consideration which it states, struck us on the argument with great surprise, as wholly inconsistent with the views which our own experience and our knowledge of the uniform practice in our courts, and of the general understanding of the profession, had led us to entertain; nor can we say that the surprise we then felt has been at all diminished by an examination of the authorities to which, as sustaining his argument, the learned counsel for the plaintiff referred us. We have been accustomed to believe, and must continue to believe, that when such a deed is valid on its face—which it can only be when it states a pecuniary consideration—and its execution and delivery are admitted or proved, the Court is bound to say that it raised a use which the Statute executed as a legal estate in the purchaser, thereby vesting in him all the right and title that the vendor possessed or had authority to convey, and which the deed purports to convey. This deed is not evidence, it is true, of the title or authority of the vendor. His right to make the convey* anee must be established by distinct and independent proof; but when this proof is given, the deed is evidence in all actions, and against all persons, of a 'transfer to the purchaser of the title which it purports to convey. The supposition that to render the deed *111 operative at all as against a stranger, or person claiming by a distinct and paramount title, any other proof of the consideration than that which it states, must in the first instance be given, is purely gratuitous. It has no support from reason or authority. There can be no higher evidence of a contract of sale than an instrument in writing, setting forth the terms of the contract, and signed, sealed, and delivered by the seller. A deed of bargain and sale is such an instrument. It sets forth and is evidence of such a contract. The law raises from the contract thus evidenced an equitable use, which the Statute converts into a legal estate corresponding -in its extent with the use declared, so that the same evidence that proves the existence of the contract, necessarily proves the transfer of title. It is not denied that the effect of the evidence depends, in many cases, upon the relation to each other of the parties to the action in which it is adduced. In many cases the evidence is conclusive. In many others, it may be contradicted and repelled. But in all, the burden of proving the falsity of the consideration stated in the deed, rests upon those who, upon that ground, deny its validity. In all cases, the consideration so stated must be held to be true, until it is proved to be false; and I am persuaded that the books may be searched in vain for any trace or intimation of an opposite doctrine.
The law, it seems to us, is equally clear as to the effect of an acknowledgment in a deed of bargain and sale, of the receipt of the purchase money. No such acknowledgment is necessary to pass the title. For that purpose, the statement of a money consideration would be alone sufficient; but without the acknowledgment, the deed would be evidence on its face of a debt due from the'purchaser, and constituting a subsisting lien upon the land. It is to discharge the purchaser and the lands that the acknowledgment is inserted: where no acknowledgment of payment is found in the deed, we cannot doubt that it is competent for the purchaser to discharge himself and the land by the production and proof of a separate receipt for the purchase money, signed by the vendor, and especially when, from the death of the vendor and the lapse of time, the receipt is the only evidence of payment that can be given. We are not aware that there is or can be any exception from the rule, that a receipt for moneys given by the party entitled to receive them, whether as owner, *112 guardian, executor or trustee, is in all cases prima facie evidence of the fact of payment, and that a trustee authorized to sell is in all cases competent to give an absolute discharge, is settled law. (Cruise, Dig., Tit. Trust, c. IV., § 30, 1, 2, 3.)
We cannot believe that the effect of a receipt as a discharge is at all varied or impaired by its incorporation in the conveyance by the trustee of the land sold. We apprehend that no court can treat an acknowledgment of payment thus incorporated, as an unmeaning form; but, on the contrary, every tribunal must hold it to be true until it is proved to be false.
Our conclusion is, that the defendant gave all the proof that, in the first instance, he was required to give, that the conveyance to Ash was founded on the valuable consideration therein stated, and that this consideration was paid at or before the execution and delivery of the deed. He therefore proved that Ash, in the full sense of the term, was a bona fide purchaser.
Nor has our conviction that this is a just and necessary conclusion, been at all weakened by any examination of the cases to which we were referred. It is, doubtless, true, that, in numerous cases, a person claiming protection as a bona fide purchaser, has been required to prove the actual payment of a valuable consideration, but it is only in cases in which his title is shown to have been affected in its origin by fraud or some other vice, that this extrinsic proof is required to be given. No case was' cited, nor do we believe that any is to be found, in which a purchaser, when no evidence to impeach Ms title has been given, has been required to give any other proof of its validity than that which results from the execution, delivery and contents of the deed from which it is derived.
The cases upon which the counsel for the plaintiff seemed mainly, if not entirely, to rely, were of a very different character ; they, indeed, tended to establish a doctrine wMch cannot be disputed, but which we are satisfied has no application to the case before us. That doctrine is, that the recitals in a deed are binding only upon parties and privies, and are no evidence of the truth of the facts recited against a stranger or person claiming by a distinct and paramount title. The doctrine is sound law, but is inapplicable to the case before us, for the plain reasons:
*113 First. Because neither a statement of the consideration in a deed of bargain and sale, nor an acknowledgment of its payment, is a recital in the legal sense of the term.
Second. Because the plaintiffs are not strangers, but privies in estate and in blood.
1. A statement of the consideration is not a recital of an antecedent fact, but a part of the res gesta, a necessary term of the contract of which the deed is the evidence, and therefore an essential and operative part of the deed as a conveyance. As a general rule, the recital may be omitted without impairing the efficacy of the deed as a conveyance, but the deed without the consideration as a conveyance is inoperative and void. It is from the consideration that it derives its vitality and force. So the acknowledgment of the payment of the consideration, although not essential to the validity of the deed, is part of an entire transaction and a declaration of a present fact: a declaration made by the only party competent to make it, and whose written declaration, from the nature of the-fact, is the best evidence of its truth.
2. The assertion that there was no privity between the plaintiffs and their father, but that they are to be regarded as strangers, claiming by a paramount title, rests entirely upon the supposition that his authority to sell, as embracing the remainder in fee, was a naked power, not connected with or derived from any estate in the land, his only estate being that of a tenant for his own life. In fewer words, that he was not a trustee of an estate, but simply a donee of a power. This supposition, however, we believe to be erroneous, and, therefore, cannot admit.
It has already been shown that the Legislature, by the act of 1815, not merely declared Clarke to be a trustee, but clothed him as such, with all the rights, powers and estate that were vested in the original trustees, by the will of Mary Clarke; and we concur with Chancellor Walworth, and Vice-Chancellor Sandford, in the opinion that by force of the statute, Clarke became seized of the legal estate in the remainder in fee expectant on his own life estate, and that the remainder devised to his children (although vested as they came into being), was purely equitable, (Opinion Chan. Walworth, 20. Wendell Rep.. 377. Williamson v. Field, 2 Sandford Ch. R. 533. Opin. V. Chan. p. 562, and passim). *114 Nor, as it seems to us, can the words of the statute he satisfied by any other construction.
I readily admit, however, that in judging of the nature and extent of Clarke’s interest or estate, we are not to look merely at the words of the statute, but that its reasonable construction is that it was not the intention of the Legislature to give to Clarke any other or greater estate than that which was devised to the original trustees. It is upon the true construction, therefore, of this devise, that the question turns. Ii^ by its legal interpretation, the estate of the trustee was to last no longer than during the life of Clarke, and the remainder in fee was devised to his children as a legal estate, the truth of the conclusion that in respect to this remainder he was the donee of a power, and not a trustee in the fall sense of the term, will not be contested; but, on the other hand, it is certain that if by force of the will the original trustees took a fee, it is to this fee that, by force of the statute, Clarke succeeded.
The devise in the will, we have seen, was to the trustees and their heirs, in trust, to receive and pay over the rents and profits to Clarke during his life, and upon his death to convey the fee to his children then living. Such a devise, under the Revised Statutes, would be valid, as a trust, only during the lifetime of the parent, and upon his death, would vest the fee, as a legal estate, in the children then living, without any conveyance or other act on the part of the trustees or their heirs. The estate of the trustee, although a fee in its terms, would be limited in its duration by the life of the person for whom the rents and profits were to be received; and if a power to sell the remainder in fee were given to the trustees, it would be valid, if valid at all, as a power only, and not as an authority connected with, and flowing from their estate.
But the state of the law was widely different when the will of Mrs. Clarke took effect, and it continued to be so many years after the death of Clarke; and it is the law, as it existed before the Revised Statutes were in 'force, that must determine the question we are now considering. Previous to the Revised Statutes, it had, for a long time, been settled, that a trust to convey lands, whether immediately or on a future day certain, was valid as an active trust, and was not a use, that the statute *115 would execute as a legal estate in the person entitled to demand the conveyance. (Garth v. Baldwin, 2 Vesey, R. 646 ; Mott v. Benton, 7 Vesey, R. 201; Fearne Con. Rem. 123; Lewin on Trusts, p. 145.)
The fee, therefore, which the trustees took under the will, was not determinable by the death of Clarke; but although upon his death his children, then living, would have been deemed in equity the absolute owners, the fee, as a legal estate, had not the trustees been discharged, would have remained, until conveyed, in them and their heirs. They were trustees, therefore, of the estate of the children—that is, trustees of the remainder in fee; and it was their estate as such trustees, and not a naked power, that the act of 1815 transferred to and vested in Clarke. It follows that there subsisted between him and the plaintiffs that privity of estate which always exists between a trustee and a cestui que trust, and which makes the acts of the former, within the scope of the trust, binding on the latter. (Lewin on Trusts, 18.)
Nor is this all. The plaintiffs were privies in blood, as well as in estate. The fee which the will created, and the Legislature vested in Clarke upon his death, descended to the plaintiffs as his heirs at law; and as they could not be trustees for themselves, the equitable fee devised to them by the will was then merged and extinguished in the legal title which they acquired by descent. Where a legal and equitable estate, commensurate in their extent, become united in an heir, it is undoubted law that the entire inheritance is regarded as coming from the parent, or other ancestor from whom the legal title descends; and its character is governed and determined by the same rules that would apply, had such parent or ancestor been not a trustee, but the absolute power. (Goodright v. Wells, Douglas, 791; Phillips v. Brydges, 3 Vesey, R. 126 ; Selby v. Alston, 3 Vesey, R. 339; Wade v. Raget, 3 Bro. Ch. Ca. 363 ; Preston on Estates, 328, 329; Lewin on Trusts, 16; Cruise Dig., tit. “ Trust,” 2, § 34, 35.) It follows, that the estate which passed to the plaintiffs upon the death of their father, they took exclusively as his heirs, and not as devisees under the will, since their equitable title, as such, by operation of law, was then extinguished.
In the strong language of the Master of the Rolls, in Phillips *116 v. Brydges, it then “ ceased, to exist;” and it seems a necessary consequence,, that hi any suit in relation to the lands, it is only as heirs that, the plaintiffs can be entitled to any recovery or relief. If it be certain, as we hold it to be, that the fee was vested in Clarke, as a trustee, the plaintiffs, in the strictest sense of the .term, are privies in blood, as well as in estate.
I have stated that we had discovered no case, and none had been cited, in which a purchaser, claiming under a deed of bargain and sale, had been required, in the first instance, to prove the consideration by, any other evidence than that of the deed itself. I have found two cases, however, that seem to be exceptions from the doctrine, that the deed is, per se, evidence of the consideration which it states; but, as is not unusual, these cases are exceptions, that, instead of weakening, illustrate and confirm the general rule. .
The first case is that of Kelson v. Kelson, 17 Jurist, 129, 17 Law and Eq. Rep. 107. The bill was filed on behalf of infant children, to set aside a mortgage, held by the defendant, as made by their father in fraud of a post-nuptial settlement, .under which the children were entitled to the income of the property. The, defendant, contended that the settlement ought to be treated as purely voluntary, and therefore void as against him, he being a purchaser for a valuable consideration. The consideration in the settlement was stated to be, “ natural love and affection, and divers other good and valuable considerations;” and the ViceChancellor (Wood), after hearing the counsel of the parties, stated the question to be, “ upon whom the onus rested of proving or disproving that these general words had any substantial meaning,” and he reserved the point until he should be furnished with cases bearing on its decision. Afterwards, in delivering his judgment, he said that the question amounted to this, whether the statement of certain other “good and valuable considerations,” not naming them, would without more, support the settlement, at least so far as to throw upon the party impeaching the settlement, the onus of showing that there was in fact no such good and valuable consideration as was referred to, and that. he had very little doubt that if a prima facie case were raised by the words, the onus would be on the defendant to upset it. He was, however, of opinion that the general words were not sufficient to *117 raise & prima facie case, but did not for that reason hold the deed to be void, thinking that the plaintiffs ought to have the opportunity of showing, if they could, that there was a good and valuable consideration. He, therefore, directed an inquiry, for the purpose of ascertaining whether the deed was founded on any, and what valuable consideration.
The second case is that of Gully v. The Bishop of Exeter, which is very clearly reported in 2 Moody & Payne, Com. Pleas Reports, 266, and is the authority on which the Vice-Chancellor, in the preceding case, chiefly relied. The cause turned entirely upon the question, whether a deed, dated so far back as 1672, was to be deemed fraudulent and void, as against subsequent purchasers, on the ground that no pecuniary consideration was stated. The considerations stated were, the sum of twenty shillings then paid, “ and divers other good and valuable considerations.” The judge, on the trial, left it to the jury to say, whether the sum of twenty shillings, coupled with the other words, was not a sufficient consideration, and the jury, by their verdict, sustained the deed. A new trial was moved for, on the ground that the Judge misdirected the jury, and that the verdict was against law. But the Chief-Justice, in delivering his judgment, said, that if the sum of twenty shillings was, as had been insisted, merely nominal, it might not have been an adequate consideration, but considering that the deed had been executed more than one hundred and fifty years ago, and the great depreciation in the value of money since that time, it would be too much to say that the sum of twenty shillings was at that time a merely nominal consideration, although the words, “ divers other good and valuable considerations,” might be regarded as mere ornament and surplusage. The other Judges concurred with these views, and a new trial was denied. The cases undoubtedly prove, that where the sum stated as a consideration in a- deed of bargain and sale is so trifling, as to justify a suspicion that it was merely nominal, the question of its reality, as against a person not bound by the deed, unless founded on a valuable consideration, must be left to the determination of a jury; and that when no sum is mentioned, and a valuable consideration is stated only in general words, the burden of showing its existence and amount is thrown upon .the party producing the deed; but the reasoning of the *118 Judges, and the actual decisions, also prove, that where a definite sum, plainly not merely nominal, is stated as the consideration, the statement, until shown to be false by the adverse party, must be received as true, and is prima facie evidence even against a stranger, for such in each of the cases was the legal character of the defendant. That this is the true rule, and the established rule, we cannot doubt.
II, I pass, then, to the second ground upon which the relief asked for is demanded: namely, that assuming the truth and payment of the pecuniary consideration mentioned in the deed, the purchaser, Ash, was bound to see that the money paid was properly applied by Clarke, and that as the sale was before the Revised Statutes had released purchasers from trustees from this allegation, the failure of Ash to perform this duty was alone sufficient to invalidate his title.
The argument assumes that a misapplication of the purchase* money by Clarke, was sufficiently proved, but it may be seriously doubted whether the proofs relied upon were not far too vague and hypothetical to sustain a judicial decision. Whether this be so or not, we are very clearly of opinion, that, had the proof been direct and positive, the misapplication of the purchase-money by Clarke would not have affected the validity of the title acquired by Ash. Ho such duty as is supposed rested upon Ash; for even as the law formerly stood, before the salutary change made by the Revised Statutes, he was not as a purchaser bound to see that the money which he had paid was duly applied by Clarke to the purposes of his trust.
The law was never so unreasonable as to impose this duty in all cases upon a purchaser from a trustee. It was imposed only in those cases in which it could be certainly and promptly dis* charged. It was imposed only when the trust required the immediate application of the proceeds of a sale to a certain and definite purpose; never when the purpose was general and unlimited; still less when it was future and contingent. Thus, when the trust directed the application of the money to be raised, to the payment of certain specified debts, naming the creditors and the sum due to each, the obligation upon the purchaser to see to their payment was imperative,- since, as a general rule, the duty might, without difficulty, be discharged; but *119 where the trust, whether of real or personal property, directed the application of purchase-money to the payment of debts generally, the purchaser was under no obligation to ascertain their amount and attend to their discharge. (2 Story’s Eq. Jur. ch. 31, § 1129 to 1138, and notes and cases there cited.) And it is manifest that with still less reason could this duty be said to attach when the debts to be satisfied were not such as then existed, but such as the trustee himself, in the discharge of his duties, might thereafter contract. Here Clarke, as a trustee, was bound to apply the purchase-money to the payment, either of debts already contracted by him for the support of his family, or such as he might thereafter contract for the same purpose. The purchaser, Ash, was not bound" to see that the existing debts were discharged, and he could not possibly see to the discharge of future debts, unless the law gave him the power, and made it his duty to direct and control Clarke and his family in their future contingent and daily expenses—a supposition plainly extravagant, and nearly absurd.
Tinder these circumstances, it is needless to consider whether, if we could hold that the duty in question attached upon Ash, his failure to perform it would have affected his title, or merely have rendered him and the defendant, Davenport, as his successor, liable to the repayment, with interest, of the consideration mentioned in the deed. The inquiry is needless, since we hold it to be certain that the payment acknowledged in the deed perfected his title, and released him, from any liability for the future acts of the trustee.
It remains only to consider whether a judgment in favor of the plaintiffs may justly be rendered upon the last ground taken by their counsel, namely: That the orders of the Chancellor, under which the sale to Ash was made, were procured by a fraudulent concealment and positive misrepresentation of material' facts; in fewer words, were obtained by fraud.
The power of a Court of Equity to relieve against a fraudulent order, or even judgment, is undoubted; and it was quite needless to cite authorities to prove its existence. Whether "the present is a proper case for the exercise of the jurisdiction is another question. To justify its exercise, two conditions are necessary; the fraud must be clearly established, and it must be proved that *120 the person against whom, the relief is sought was a party or privy to its perpetration, or had notice, actual or constructive, of its existence, when he acquired his title; and here, both these conditions, it appears to me, are wanting.
We were unable to gather from the evidence, or from the argument of the counsel, what were the material facts that Clarke is alleged to have concealed. If the meaning was, that when he applied for the order of sale, it was his fraudulent intention to apply the proceeds to his own use, and not to the purposes of his trust, we cannot say, upon the evidence before us, that, at that time, such was his intention; and had this intention been proved, we cannot see that an intention locked up in bis own breast, and which he’ might have abandoned, could have affected the validity of the order which the Legislature, if certain facts were proved, had directed the Chancellor to make. If the requisite proof was given, the order was not obtained by fraud. As to the representations of Clarke, all that he made were contained in the petition that he addressed to the Chancellor, in 1815, and upon which the order of July was founded. This petition was referred to a Master, who, upon the testimony of witnesses, reported, that the trust estate was wholly unproductive, and that a sale of portions of it to enable Clarke to discharge the debts contracted by him for the benefit of his family, and to provide the means for the future support and education of his children, was indispensable. This report was adopted by the Chancellor, and made the basis of the order of sale. This order was, therefore, a judicial determination of the truth of the facts contained in the report, and, consequently, of the truth of the representations made in the petition, and as we can have no right to say without evidence, that the testimony before the Master was false, or that he was himself guilty of collusion and fraud, it is a determination that we must hold to be conclusive.
Again, had the alleged fraud been proved by the clearest evidence, it could not have affected the title of Ash, as a purchaser for value, and without notice. It is familiar law, that when the lands of a debtor have been sold by the Sheriff under a judgment and execution, regular and valid upon their face, the title of the purchaser is not disturbed by the subsequent reversal of the judgment, even where the reversal is for error apparent *121 upon the record. (Jackson v. Rosevelt, 13 John Rep. 97; Wood v. Jackson, 8 Wendell R. 9; Woodcock v. Bennet, 1 Cowen R. 711.) And it seems to us that the principle applies even with greater force where the judgment is sought to be impeached, upon the ground of a secret fraud. Here the order of 1817, under which the sale was made, was valid on its face, and the sale and conveyance were in strict conformity to its terms.
The order the Court of Errors has decided was a judicial act, and the sale that followed, a judicial sale. The order was, therefore, equivalent to a judgment, and the sale by the trustees, to a sale by the Sheriff. Such being the fact, we say, with entire confidence, that a Court of Equity could never allow the title of a purchaser from the trustee to be divested, by proof of a fraud, of which he was wholly ignorant, and the existence of which he had no reason to suspect; such a decision would be a very .plain violation of the principles by which the administration of equity, in the protection that it extends to bona fide purchasers, has invariably been governed. (1 .Story’s Eq. Jur. ,§ 64, c. 108, 630, 631; 2 ditto, § 1502, 3.) It may be admitted that the fraud of Clarke is sufficiently alleged in the bill; but we do not find that the purchaser, Ash, is charged with notice, actual or constructive; and were the charge to be found in the bill, no evidence to sustain the imputation was given or offered upon the hearing. We are bound to say that Ash, in the fullest sense of the term, was a bona fide purchaser.
It is needless to proceed further, and here I close the discussion.
Our conclusions upon the whole case are—
1st. That Thomas B. Clarke, in November, 1817, when he sold and conveyed to Thomas Ash the lots in controversy, had full power and authority, as a trustee, under the acts of the Legislature and orders of the Chancellor, mentioned in the pleadings, to sell the same, and to give to a bona fide purchaser a good and indefeasible title.
2d. That the conveyance to Ash, in its terms and upon its face, was exactly such as Clarke, under the statutes and orders before mentioned, was frilly authorized to make.
3d. That this conveyance, being a deed of bargain and sale, and its execution and delivery being admitted, was sufficient proof, in the first instance, that it was in reality founded upon *122 the pecuniary consideration therein stated; and that the acknowledgment therein contained was also sufficient proof that the consideration mentioned was, in fact, paid.
4th. That this deed, therefore, upon its face, raised a use which, by force of the statute, was executed in the purchaser, thereby vesting in him • a full legal title to the premises in question.
5th. That the burthen of proof to impeach the validity of the deed, by showing a different consideration from that therein stated, was cast upon the plaintiffs, and that the allegations in the bill, which were put in issue by the answer, that the true and only consideration was the satisfaction of an antecedent debt contracted by Clarke for his personal benefit, were wholly unsustained by proof.
6th. That the title acquired by Ash was not impaired or affected by an alleged misapplication by Clarke of the purchase-money received- by him—the case not belonging to any class of those in which, as the law formerly stood, a purchaser from a trustee was bound to see that the purchase-money was properly applied to the purposes of the trust.
7th. That there was no evidence that could justify the court in saying that the orders of the Chancellor, under which the sale and conveyance to Ash were made, were procured, as is alleged, by a concealment and misrepresentation of material facts; but that, on the contrary, the truth of the representations contained in the petition of Clarke, upon which the orders were founded, was established by the report of the master, to whom the petition was referred, and by the confirmation of that report by the Chancellor.
Eighth. That, had the clearest proof been given that the orders in question were procured by fraud, yet, as they were regular and valid on their face, the fraud would not have affected the title of an innocent purchaser, and there was nothing in the pleadings or proofs to show that actual or constructive notice was imputable to Ash.
Our decision, therefore, is, that the plaintiffs had no right to maintain this action, and that the bill must be dismissed with costs.
We have omitted to notice the decision of the Supreme Court *123 of the United States, in the case of Williamson v. Berry (8 Howard, U. S. Rep. 495), by which, in direct opposition to that of our own Court of Errors, in Cochrane v. Van Surlay, the orders of the Chancellor were adjudged to be not merely voidable, but absolutely void. The omission has been intentional, since, with the utmost respect for that high tribunal, we cannot think that its decision upon questions of local law, questions relating to the construction of our own Statutes, and the jurisdiction of our own Courts, carry with them any weight of authority when opposed to those of our own Court of ultimate jurisdiction. By ns, at least, the latter must be regarded as conclusive evidence of the law, that we are bound to declare.
Judgment, dismissing the bill with costs, (a)